IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2016 Term

**FILED**

**September 28, 2016**

released at 3:00 p.m.
RORY L. PERRY, II CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 15-0535

STATE OF WEST VIRGINIA,
Plaintiff Below, Respondent

v.

RICKIE L. GREENFIELD JR.,
Defendant Below, Petitioner

Appeal from the Circuit Court of Berkeley County
Honorable Michael D. Lorensen, Judge
Criminal Action No. 13-F-233

AFFIRMED

Submitted:  September 13, 2016
Filed: September 28, 2016

B. Craig Manford, Esq.
Martinsburg, West Virginia
Counsel for Petitioner

Cheryl K. Saville,
Assistant Prosecuting Attorney
Martinsburg, West Virginia
Counsel for Respondent

JUSTICE LOUGHRY delivered the Opinion of the Court.

**SYLLABUS BY THE COURT**

1. "A jury verdict may not ordinarily be impeached based on matters that occur during the jury's deliberative process which matters relate to the manner or means the jury uses to arrive at its verdict." Syl. Pt. 1, *State v. Scotchel*, 168 W.Va. 545, 285 S.E.2d 384 (1981).

2. "The extent to which prior convictions may be introduced to impeach the credibility of a witness other than the defendant in a criminal trial rests within the sound discretion of the trial court." Syl. Pt. 9, *State v. Davis*, 176 W.Va. 454, 345 S.E.2d 549 (1986).

3. "A trial court's evidentiary rulings, as well as its application of the Rules of Evidence, are subject to review under an abuse of discretion standard." Syl. Pt. 4, *State v. Rodoussakis*, 204 W.Va. 58, 511 S.E.2d 469 (1998).

4. "'A trial court is afforded wide discretion in determining the admissibility of videotapes and motion pictures.' Syllabus Point 1, *Roberts v. Stevens Clinic Hospital, Inc.*, 176 W.Va. 492, 345 S.E.2d 791 (1986)." Syl. Pt. 9, *State v. Rodoussakis*, 204 W.Va. 58, 511 S.E.2d 469 (1998).

i

5. "The admissibility of photographs over a gruesome objection must be determined on a case-by-case basis pursuant to Rules 401 through 403 of the West Virginia Rules of Evidence." Syl. Pt. 8, *State v. Derr*, 192 W.Va. 165, 451 S.E.2d 731 (1994).

6. "Rule 401 of the West Virginia Rules of Evidence requires the trial court to determine the relevancy of the exhibit on the basis of whether the photograph is probative as to a fact of consequence in the case. The trial court then must consider whether the probative value of the exhibit is substantially outweighed by the counterfactors listed in Rule 403 of the West Virginia Rules of Evidence. As to the balancing under Rule 403, the trial court enjoys broad discretion. The Rule 403 balancing test is essentially a matter of trial conduct, and the trial court's discretion will not be overturned absent a showing of clear abuse." Syl. Pt. 10, *State v. Derr*, 192 W.Va. 165, 451 S.E.2d 731 (1994).

7. "To trigger application of the 'plain error' doctrine, there must be (1) an error; (2) that is plain; (3) that affects substantial rights; and (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings." Syl. Pt. 7, *State v. Miller*, 194 W.Va. 3, 459 S.E.2d 114 (1995).

8. "The function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to

determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt." Syl. Pt. 1, *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995).

9. "A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt. To the extent our prior cases are inconsistent, they are expressly overruled." Syl. Pt. 3, *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995).

**LOUGHRY, Justice:**

The petitioner, Rickie L. Greenfield Jr.,[1] appeals the May 4, 2015, order of the Circuit Court of Berkeley County denying his post-trial motions for a judgment of acquittal or, alternatively, a new trial. He was convicted of first degree murder for killing his wife by striking her multiple times in the head with a hammer. The jury did not recommend mercy. In this appeal of his conviction, the petitioner raises seven assignments of error pertaining to the following trial issues: length of the jury deliberations, limitation of impeachment evidence concerning a witness's prior conviction, allowing the jury to view a witness's videotaped statement, admission of a color photograph of the victim, admission of correspondence the petitioner signed with the nickname "Hammer," sufficiency of the evidence to support the conviction, and cumulative error. After a thorough review of the record on appeal, the parties' arguments, and the relevant law, we find no error and, accordingly, affirm.

## I. Factual and Procedural Background

The petitioner was indicted for first degree murder for the death of his wife, Jill Greenfield, in violation of West Virginia Code § 61-2-1 (2014). The case went to trial in January of 2015, where the State of West Virginia presented the following evidence.

---

[1]The petitioner's first name is sometimes spelled "Ricky" in the appendix record. The record does not specify which spelling is correct.

1

After separating from the petitioner, in August of 2013, Ms. Greenfield continued to live in the former marital residence, an apartment in Martinsburg, West Virginia. The petitioner moved into the home of his girlfriend, Kristin Strong. At some point Ms. Strong told the petitioner's father, Rickie "Rick" Greenfield Sr.,[2] that she was concerned about the petitioner. Rick knew the petitioner and Jill could really "push each other's buttons" and that the petitioner had previously threatened to harm or kill Jill, although Rick had not taken his son's threat seriously. Acting on Ms. Strong's concern, Rick spoke with the petitioner and determined that the petitioner was feeling hurt and wanted his wife back. When they spoke on the evening of August 21, 2013, Rick and the petitioner discussed that the petitioner was going to Jill's apartment that night to drop off his young children.[3] Concerned about what his son might do, Rick urged the petitioner to remain calm and not bring a gun to the apartment. Ms. Strong confirmed that the petitioner and his children left her home on the night of August 21 for the purpose of taking the children to Jill's apartment.

At 9:47 p.m. that same night, the petitioner telephoned his father and confessed that he had just killed Jill by hitting her in the head with a hammer. The petitioner told his father he had tried to talk to Jill, but he "went crazy" when she said she would "screw" other

_____

[2]To avoid confusion, the petitioner Rickie Greenfield Jr. is referred to herein as "the petitioner," while his father, Rickie Greenfield Sr., is identified as "Rick Greenfield" or "Rick."

[3]The petitioner and Jill Greenfield had two daughters together. In August of 2013, the children were one and three years old.

people and she no longer wanted a relationship with him. Rick Greenfield could hear his grandchildren in the background of the telephone call. Although the petitioner initially told his father he was "running from the law" and was suicidal, he then agreed not to harm himself or the children and to turn himself over to the authorities.

The petitioner sent a text message to his sister, Amanda Kellett, at 9:55 p.m. that night. The message read, "call me 911 emergency." When Ms. Kellett called him a few minutes later, the petitioner was crying and confessed that he had just killed Jill with a hammer. The petitioner stated he had struck Jill "at least fifty times" and "she doesn't have a face" anymore. According to Ms. Kellett's trial testimony, the petitioner said he "snapped" when Jill told him she would "screw anybody [she] want[ed] to in front of our girls." Ms. Kellett also recounted her knowledge of troubles in the petitioner and Jill's marriage. Although the petitioner and Jill were separated and the petitioner was in a relationship with Ms. Strong, Ms. Kellett explained that the petitioner had "a really hard time" when Jill told him of her relationships with other people. Ms. Kellett testified, "what really made it hard [was] when Jill no longer wanted him."

Ms. Strong testified that the petitioner and the children returned to her home on the night of August 21st. According to Ms. Strong, the petitioner appeared to be scared and worried, and he told her that Jill had died. Upon being confronted at trial with a written

3

transcript of the videotaped statement she gave to police, Ms. Strong then admitted that the petitioner had also told her that he had argued with his wife and had killed her by beating her in the face with a hammer.

Meanwhile, Rick Greenfield was unsure of whether Jill Greenfield was really dead, as his son had declared over the telephone. Rick and his brother-in-law drove to Jill's apartment, found the door locked, and knocked but received no answer. The brother-in-law called 911 at 10:15 p.m., and the responding police officers broke in the apartment door to discover the crime scene.

Jill Greenfield's deceased body was found lying near the edge of the bed in her bedroom, with her feet on the floor, her pants partly unzipped, and her head covered with a blanket. When the blanket was removed, police observed that she was covered in blood and had severe head trauma. There was blood splatter in the bedroom, but no signs of a struggle anywhere in the apartment. A weathered ball peen hammer, covered in what was later confirmed to be the victim's blood, was found on the bed near the body.

The victim's next-door neighbors, Kaitlin and Colin Shanahan, testified that on the night of the murder, they left their apartment at 8:30 p.m. and returned at 9:00 p.m. or shortly thereafter. They did not hear any signs of an attack, but at approximately 9:15 or

4

9:30 p.m.[4] they were sitting in their living room when they heard the sounds of heavy footsteps and of children descending the wooden staircase shared by their apartment and the Greenfield apartment. The Shanahans recognized these sounds as being made by the Greenfield children and by the petitioner descending the stairs in his work boots.[5]

At 10:32 p.m. that night, the petitioner called Rick Greenfield and revealed that he was at Ms. Strong's residence. The police immediately went to Ms. Strong's home and arrested the petitioner. When he was taken into custody, the petitioner had blood on his shirt and pants. Subsequent testing by experts at the State Police Laboratory confirmed that this blood belonged to the victim. Moreover, the police found boxes of miscellaneous tools in the petitioner's truck.[6]

While in a police cruiser being transported to the police station, the petitioner overheard a radio report about the presence of a coroner at his wife's address. He asked Patrolman Scott Shelton whether "they had saved" his wife. The officer disclosed that she

---

[4]The Shanahans were able to recall the time when they heard the footsteps and the children descending the stairs because Ms. Shanahan had remarked to her husband that the children should have been in bed at that hour.

[5]The petitioner had resided in the apartment next to the Shanahans until his recent separation.

[6]The petitioner was employed as a machine operator. When arrested, he was wearing his work clothes and boots.

5

was deceased. The petitioner then told the officer that he and his wife had been experiencing marital problems, they had argued while inside the apartment, and he had "snapped."[7]

Dr. Vernard Adams, the expert pathologist who performed an autopsy on the victim, reported that she had multiple lacerations on her head and face accompanied by fractures of the underlying bones in several places. The doctor determined that seven or eight blows had been inflicted, mostly to the front part of the head. The victim's injuries included an open fracture over the bridge of her nose that went through the skull and the dura matter of the brain. Dr. Adams testified that "from all of these wounds of the face, the contour of the face was depressed. That is[,] it was pushed in and did not rebound." The cause of death was determined to be multiple blows inflicted by a small, hard, blunt object, such as a hammer.

After hearing and deliberating on the evidence presented at the January 2015 trial, the jury found the petitioner guilty of first degree murder and did not recommend mercy.[8] By order entered on May 4, 2015, the circuit court denied the petitioner's post-trial

---

[7]The circuit court granted a pre-trial motion to suppress the petitioner's statements made in the police car. However, as a matter of trial strategy, the petitioner elicited this evidence during his case-in-chief.

[8]The trial was not bifurcated into separate guilt and mercy phases.

motion for a judgment of acquittal or a new trial and sentenced him to life in prison without the possibility of parole.

## II. Standards of Review

The petitioner appeals the circuit court's order denying his post-trial motions for a new trial or judgment of acquittal. We apply the following standards when reviewing a circuit court's decision to deny a motion for new trial:

> In reviewing challenges to findings and rulings made by a circuit court, we apply a two-pronged deferential standard of review. We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a de novo review.

Syl. Pt. 3, *State v. Vance*, 207 W.Va. 640, 535 S.E.2d 484 (2000). Furthermore, "[t]he Court applies a de novo standard of review to the denial of a motion for judgment of acquittal based upon the sufficiency of the evidence." *State v. Juntilla*, 227 W.Va. 492, 497, 711 S.E.2d 562, 567 (2011) (citing *State v. LaRock*, 196 W.Va. 294, 304, 470 S.E.2d 613, 623 (1996)). Where more particularized standards of review apply to specific assignments of error, they are set forth below. Accordingly, we proceed to consider whether the petitioner is entitled to the reversal of his conviction.

7

### III.  Discussion

### A.  Length of Jury Deliberations

The petitioner contends it was error for the circuit court to have denied his motion for a new trial when the jury returned its verdict after deliberating "only seventy minutes."  He argues that seventy minutes was an insufficient period of time for the jury to adequately consider the court's instructions, the witness testimony, and what he reports was "voluminous" documentary evidence presented during the four-day trial.  He suggests  the jury must have been swayed by an emotional response to the brutal nature of the crime.  Arguing there was no error, the State responds that only two days of the trial were devoted to the admission of evidence; all of the documentary evidence was explained or summarized by the witness testimony; several of the documents were duplicative;[9] and there was extensive proof of the petitioner's guilt.

When determining whether a verdict may be impeached based on matters of jury conduct, we first ascertain whether the challenge is intrinsic or extrinsic to the deliberative process.  For intrinsic matters, we have held that "[a] jury verdict may not ordinarily be impeached based on matters that occur during the jury's deliberative process

---

[9]The trial transcript reflects that the exhibits included multiple photocopies of cellular telephone records and of text messages forensically recovered from cellular telephones. The information in these documents was summarized and, where relevant, read into the record by witnesses.

which matters relate to the manner or means the jury uses to arrive at its verdict." Syl. Pt. 1, *State v. Scotchel*, 168 W.Va. 545, 285 S.E.2d 384 (1981). However, "a jury verdict may be impeached for matters of misconduct extrinsic to the jury's deliberative process." *Id*. at 545, 285 S.E.2d at 385, syl. pt. 2, in part. There are several reasons for precluding impeachment of a jury's verdict based on matters intrinsic to the deliberations:

> The reason traditionally advanced to preclude impeachment of the jury verdict based on what occurred during the jury's deliberations is primarily grounded on public policy protecting the privacy of the jurors. This policy prevents both litigants and the public from being able to gain access to the jury's deliberative process. Inherent in this proposition is the recognition that ensuring the privacy of the jury's deliberations will promote a full, frank and free discussion of all the issues submitted to the jury. It is also recognized that the very nature of the deliberative process, which requires the jurors to arrive at a unanimous verdict, must of necessity require accommodation of individual views. This process of accommodation should not be utilized as a means to attack the general verdict. The rule against impeachment of the verdict also serves to prevent litigants from attempting to influence or tamper with individual jurors after the verdict has been rendered. There is also recognition that limiting impeachment promotes finality of jury verdicts.

*Id.* at 548, 285 S.E.2d at 387 (citations omitted).

Elaborating on *Scotchel*, we explained in *State v. Jenner* that a challenge to a jury's verdict that is based solely upon the length of the deliberations constitutes an intrinsic challenge that we will not entertain. *State v. Jenner*, 236 W.Va. 406, 417, 780 S.E.2d 762, 773 (2015). "The length of jury deliberations is necessarily indeterminate[]" and "could

9

signify that the jury found overwhelming evidence of guilt not justifying the possibility of parole." *Id.; accord State v. Mayle*, No. 13-0437, 2014 WL 2782126, at * 4 (W.Va. June 19, 2014) (memorandum decision) (recognizing that length of jury deliberations constitutes intrinsic challenge to verdict). Relying solely on the length of the deliberations, without something more, constitutes nothing other than a presumption of juror misconduct. "[T]he mere allegation of juror misconduct is insufficient to warrant a new trial . . . there must be proof that some improper event has occurred. Misconduct on the part of the jury as grounds for a new trial is not presumed but must be fully proved by the moving party." *State v. Trail*, 236 W.Va. 167, 175, 778 S.E.2d 616, 624 (2015) (citation and internal quotation marks omitted).

The United States Court of Appeals for the Seventh Circuit provided an illuminating discussion on this topic in *United States v. Cunningham,* 108 F.3d 120 (7th Cir. 1997). When deciding the appeal of a criminal conviction where the jury deliberations had lasted just ten minutes, the court reasoned that

> the time it takes the jury to decide is not the relevant factor. The weight of the evidence is [the relevant factor]. . . . If we trust our jury system, we must trust our jurors. Before attaching great significance to the short time the jury took for deliberations, we must have reason to suspect that the jury in some way disregarded its instructions or otherwise failed in its duty. A brief deliberation cannot, alone, be a basis for an acquittal.

*Id.* at 123-24 (citations omitted).  This conclusion is in line with the decisions of other courts. *See* B.K. Carpenter, Annotation, *Effect on Verdict in Criminal Case of Haste or Shortness of Time in Which Jury Reached It*, 91 A.L.R. 2d 1238 (1963 & Supp. Feb. 2016) (finding no criminal case in which abbreviated length of deliberations constituted reversible error).

The record shows that the overwhelming weight of the evidence at trial pointed to the petitioner's guilt. He confessed to his father, sister, and girlfriend that he killed Ms. Greenfield by inflicting hammer blows; the victim's blood was on his clothing; and he was placed at the scene of the crime.[10]  The evidence was straightforward and uncomplicated, with no challenges made to the scientific evidence or the cause of death.  The petitioner has offered nothing but the bare speculation of juror misconduct, and we have no basis upon which to conclude that the jury ignored its instructions or failed to consider the evidence. We therefore find the circuit court did not abuse its discretion when rejecting this claim.

### B.  Limitation of Impeachment Evidence

The petitioner asserts error regarding the circuit court's limitation of the prior conviction evidence that he offered to impeach a State's witness.  Additional background information is necessary to discuss this issue.

---

[10]The sufficiency of the evidence to support the conviction is further addressed in section III-F of this opinion.

11

At the beginning of trial, one theory of the petitioner's case was that someone else, perhaps a man named Michael Stotler, had killed the victim. Jill Greenfield had been in a romantic relationship with Mr. Stotler that she ended shortly before her death. Mr. Stotler testified at trial that he and Ms. Greenfield remained on good terms, he was not angry with her, and he did not kill her. Arguing that Mr. Stotler's testimony downplayed his motive to commit the murder, the petitioner sought to impeach his credibility with evidence that Mr. Stotler, a firefighter, had been convicted of arson in Virginia in 1986. Because the conviction was more than ten years old, the circuit court correctly recognized that the admissibility of this evidence was limited by West Virginia Rule of Evidence 609(b) (2016).[11] The circuit court, after weighing the probative value of the evidence against its

---

[11]The relevant portion of Rule 609, "Impeachment by Evidence of a Criminal Conviction," provides:

> (a) *General Rule*.
> . . . .
> (2) *All Witnesses Other Than Criminal Defendants.* For the purpose of attacking the credibility of a witness other than the accused
> (A) evidence that the witness has been convicted of a crime shall be admitted, subject to Rule 403, if the crime was punishable by death or imprisonment in excess of one year under the law under which the witness was convicted, and
> (B) evidence that the witness has been convicted of a crime shall be admitted if it involved dishonesty or false statement, regardless of the punishment.
> (b) *Limit on Using the Evidence After 10 Years.* This subdivision (b) applies if more than 10 years have passed since the witness's conviction or release from confinement for it, whichever is later. Evidence of the conviction is admissible

prejudicial effect, determined that the prior conviction was of limited probative value. However, in an effort to allow the petitioner reasonable latitude in presenting his defense, the court permitted defense counsel to elicit that Mr. Stotler had an unspecified felony conviction without identifying the offense or its particulars.

The petitioner argues the circuit court erred by prohibiting his inquiry into the nature of the 1986 conviction. We review this issue for abuse of discretion. *See* Syl. Pt. 9, *State v. Davis*, 176 W.Va. 454, 345 S.E.2d 549 (1986) ("The extent to which prior convictions may be introduced to impeach the credibility of a witness other than the defendant in a criminal trial rests within the sound discretion of the trial court."); Syl. Pt. 4, *State v. Rodoussakis*, 204 W.Va. 58, 511 S.E.2d 469 (1998) ("A trial court's evidentiary rulings, as well as its application of the Rules of Evidence, are subject to review under an abuse of discretion standard.").

The record makes clear that impeaching Mr. Stotler with the particulars of his conviction would have had no probative value in this case. *See* W.Va. R. Evid. 609(b)(1)

only if the court determines, in the interests of justice, that:
(1) its probative value, supported by specific facts and circumstances, substantially outweighs its prejudicial effect; and
(2) the proponent gives an adverse party reasonable written notice of the intent to use it so that the party has a fair opportunity to contest its use.

13

(directing trial court to determine whether "probative value, supported by specific facts and circumstances, substantially outweighs its prejudicial effect"). The conviction was approximately twenty-nine years ago and concerned arson, a crime different from the bludgeoning of someone to death with a hammer. Before Mr. Stotler testified, the State had already offered a plethora of evidence–including the petitioner's multiple admissions–to prove that it was the petitioner who killed Jill Greenfield. Indeed, as the evidence was developed at trial, the petitioner essentially abandoned his theory that someone else was the perpetrator, focusing instead on reducing the degree of his own criminal culpability and seeking mercy.

In light of the specific facts and circumstances of this case, the circuit court could have properly excluded evidence of Mr. Stotler's conviction in its entirety pursuant to Rule 609(b). Instead, the trial court granted the petitioner some leeway. The trial court's ruling to allow the limited impeachment evidence did not constitute an abuse of discretion.

### C. Admission of Video-Recorded Statement

The petitioner argues that the circuit court's admission into evidence of a video recording of the statement Ms. Strong gave to police violated West Virginia Rule of Evidence 403 (2016). He relies on the portion of this Rule that states, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of

14

one or more of the following: . . . undue delay, wasting time, or needlessly presenting cumulative evidence." *Id.*, in part. According to the petitioner, the video was cumulative because the prosecutor had already impeached Ms. Strong using a written transcript of her recorded statement. The State responds that the probative value of the video substantially outweighed any danger of undue delay or waste of time, and it was not cumulative of other evidence. Moreover, the State contends that Ms. Strong, who was the petitioner's girlfriend, provided multiple evasive answers during her trial testimony that were contradicted by what she told police in the recorded statement.

The trial court overruled the petitioner's cumulative objection and found the video recording had independent evidentiary value. For example, the circuit court determined that the video would address an issue that arose during Ms. Strong's testimony regarding whether the police told her a hammer was used to commit the murder, or whether the petitioner gave her this information.

Consistent with our standard of review for other evidentiary rulings, "'[a] trial court is afforded wide discretion in determining the admissibility of videotapes and motion pictures.' Syllabus Point 1, *Roberts v. Stevens Clinic Hospital, Inc.*, 176 W.Va. 492, 345 S.E.2d 791 (1986)." *Rodoussakis*, 204 W.Va. at 61, 511 S.E.2d at 472, syl. pt. 9. The circuit court gave a logical reason for why it found the video recording to be relevant and not

15

cumulative, and there is nothing in the appendix record or the petitioner's argument to demonstrate that the court abused its discretion in admitting this evidence.

### D. Admission of Color Photograph

The State offered into evidence a single, color photograph of the deceased victim taken by police at the crime scene. This photograph showed the victim's fatal injuries, open eyes, and blood on and around her head. The trial court admitted the photograph over the petitioner's objection that it was gruesome and unduly prejudicial.

The test for admissibility of such photographs was set forth in syllabus point eight of *State v. Derr*, 192 W.Va. 165, 451 S.E.2d 731 (1994): "The admissibility of photographs over a gruesome objection must be determined on a case-by-case basis pursuant to Rules 401 through 403 of the West Virginia Rules of Evidence."[12] The Court further explained that

---

[12]Rule 401 provides, "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." W.Va. R. Evid. 401 (2016). Rule 402 directs that relevant evidence is admissible unless a constitutional provision, a different rule of evidence, or a rule of court provides otherwise. W.Va. R. Evid. 402 (2016). Rule 403 provides, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." W.Va. R. Evid. 403 (2016).

Rule 401 of the West Virginia Rules of Evidence requires the trial court to determine the relevancy of the exhibit on the basis of whether the photograph is probative as to a fact of consequence in the case. The trial court then must consider whether the probative value of the exhibit is substantially outweighed by the counterfactors listed in Rule 403 of the West Virginia Rules of Evidence. As to the balancing under Rule 403, the trial court enjoys broad discretion. The Rule 403 balancing test is essentially a matter of trial conduct, and the trial court's discretion will not be overturned absent a showing of clear abuse.

*Id.* at 168, 451 S.E.2d at 734, syl. pt. 10.

The circuit court completed this analysis when admitting the photograph, and the petitioner concedes the photo was relevant pursuant to Rule 401. However, he argues that in applying the balancing test of Rule 403, the photo should have been admitted in black and white instead of in color. The petitioner contends that a black and white photo would have been just as effective in demonstrating the manner and degree of the injuries, and he claims that "[n]ot evident in the record was the jury's gasps of shock and horror" when the color exhibit was published.

The State responds that the photograph was not unfairly prejudicial because it accurately depicted the injuries to the victim and the condition in which she was found at the crime scene. The State argues that it was entitled to present its evidence, and the victim's condition was probative of the element of malice and the issue of mercy. Finally,

17

considering the amount of blood on and surrounding the victim, the State argues that it is questionable whether a black and white photograph would show anything other than a field of gray. When this issue was raised during the post-trial motions, the circuit court agreed that a black and white photo would not have adequately depicted the gradations of color necessary for the jury to understand the nature of the injury.

The petitioner's sole complaint is that the photo was gruesome because it was in color. We agree with the trial court's conclusion that a black and white photo would not have accurately depicted the victim's condition. The State had a legitimate basis for showing the nature of the crime, the force used, and the extent of the victim's injuries. The probative value of this evidence outweighed any prejudicial effect. Consequently, we find no abuse of discretion in the admission of this exhibit.

### E.  Evidence the Petitioner Signed Correspondence as "Hammer"

During the State's direct examination of the petitioner's girlfriend, the prosecutor asked whether the petitioner ever signed his letters to her using a nickname or anything other than his name, "Rickie." Ms. Strong answered that he had signed as "Hammer." The prosecutor then inquired, "The hammer. Did you find that funny?" Ms. Strong answered, "At first." Defense counsel made no objection during this exchange.

On appeal, the petitioner contends that "the remark" was unwarranted information intended to inflame the jury, thus constituting prosecutorial misconduct warranting a new trial. He references the standard this Court set forth in *State v. Sugg*, 193 W.Va. 388, 456 S.E.2d 469 (1995), for determining whether to reverse a conviction based upon improper prosecutorial commentary.[13] However, the petitioner's brief is unclear as to exactly what he is challenging when he says "the remark." If the petitioner is referencing Ms. Strong's answer, "Hammer," then, as the State correctly observes, her answer was witness testimony, not a prosecutorial comment. If, instead, the petitioner is referencing the prosecutor's follow-up question of whether the witness thought "Hammer" was funny, the

---

[13]Syllabus points five and six of *State v. Sugg* provide:

> 5. A judgment of conviction will not be set aside because of improper remarks made by a prosecuting attorney to a jury which do not clearly prejudice the accused or result in manifest injustice.

> 6. Four factors are taken into account in determining whether improper prosecutorial comment is so damaging as to require reversal: (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters.

193 W.Va. at 393, 456 S.E.2d at 474.

19

circuit court noted that this was asked because Ms. Strong smiled when answering the prior question.[14]

In ruling on the petitioner's post-trial motion, the circuit court found that the prosecutor had not made any improper comments but, even if she had, the petitioner would still not be entitled to relief. Applying the *Sugg* test,[15] the circuit court noted that this exchange between the prosecutor and Ms. Strong was isolated and, absent the exchange, there remained compelling evidence to establish the petitioner's guilt beyond a reasonable doubt.

For purposes of this opinion, we assume the petitioner is complaining that the jury heard something about the "Hammer" signature. Because no objection was raised at trial, we review this issue for plain error. "To trigger application of the 'plain error' doctrine, there must be (1) an error; (2) that is plain; (3) that affects substantial rights; and (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings." Syl. Pt. 7, *State v. Miller*, 194 W.Va. 3, 459 S.E.2d 114 (1995).

---

[14]The circuit court's recollection of Ms. Strong's facial expression was set forth on the record during the hearing on the post-trial motions.

[15]*See supra*, n. 13.

The petitioner claims that "obviously" the State obtained a copy of correspondence containing the signature in question, but failed to disclose the correspondence in pre-trial discovery. In its appellate response brief, the State proffers that the prosecution learned this information by listening to recorded jail telephone calls between the petitioner and Ms. Strong where they talked about his signature, and that the recordings of these calls *were* provided to the defense in pre-trial discovery. The pre-trial discovery is not included in the appendix record on appeal, thus we are unable to independently confirm the State's representation. Nonetheless, we note the petitioner did not exercise his opportunity to dispute this assertion by filing a reply brief. Given the appellate record before us, we find the petitioner has not demonstrated a pre-trial discovery violation.

Next, the petitioner complains that information about the "Hammer" signature was so prejudicial as to have improperly inflamed the jury. He argues that the jurors might have granted the petitioner mercy, or found the petitioner guilty of a lesser-included offense, if they had not heard about the moniker. We disagree. To affect the petitioner's substantial rights, the exchange between the prosecutor and witness "must have affected the outcome of the proceedings in the circuit court." *See id.* at 18, 459 S.E.2d at 129. Even if this isolated exchange had not occurred, there was more than sufficient evidence for the jury to find the

21

petitioner guilty of first degree murder beyond a reasonable doubt.[16]  In addition, the jury's

denial of mercy is supported by, *inter alia*, the extremely brutal nature of the murder and the

fact that the crime was committed while the victim's young children were in the apartment.

### F.  Sufficiency of the Evidence to Support the Conviction

The petitioner argues the circuit court should have granted his motion for a

judgment of acquittal because the State failed to prove first degree murder beyond a

reasonable doubt.  When reviewing a claim of insufficiency of the evidence, we review all

of the evidence and accept all inferences from a vantage point most favorable to the State:

> The function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt.

Syl. Pt. 1, *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995).

> A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden.  An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution.   The

---

[16]The sufficiency of the evidence to support the conviction is discussed in section III-F of this opinion.

22

evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt.

*Id.* at 663, 461 S.E.2d at 169, syl. pt. 3, in part. The evaluation of a sufficiency of the evidence argument was also discussed in syllabus point two of *State v. LaRock*, 196 W.Va. 294, 470 S.E.2d 613 (1996):

When a criminal defendant undertakes a sufficiency challenge, all the evidence, direct and circumstantial, must be viewed from the prosecutor's coign of vantage, and the viewer must accept all reasonable inferences from it that are consistent with the verdict. This rule requires the trial court judge to resolve all evidentiary conflicts and credibility questions in the prosecution's favor; moreover, as among competing inferences of which two or more are plausible, the judge must choose the inference that best fits the prosecution's theory of guilt.

*Id.* Finally, this Court may accept any adequate evidence, including circumstantial evidence, as support for a conviction:

Circumstantial evidence . . . is intrinsically no different from testimonial evidence. Admittedly, circumstantial evidence may in some case point to a wholly incorrect result. Yet this is equally true of testimonial evidence. In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. In both, the jury must use its experience with people and events in weighing the probabilities. If the jury is convinced beyond a reasonable doubt, we can require no more.

23

*Guthrie*, 194 W.Va. at 668, 461 S.E.2d at 174 (*quoting Holland v. United States*, 348 U.S. 121, 139-40 (1954)).

To establish first degree murder, the State was required to prove beyond a reasonable doubt that the petitioner committed the intentional, deliberate, and premeditated killing of Jill Greenfield. *See* W.Va. Code § 61-2-1; *State v. Browning*, 199 W.Va. 417, 420, 485 S.E.2d 1, 4 (1997) (reciting elements of first degree murder); *Guthrie*, 194 W.Va. at 676, 461 S.E.2d at 182 (discussing first degree murder jury instruction). The evidence presented at trial overwhelmingly proved that it was the petitioner who killed his wife. The forensic pathologist testified that the victim died from multiple blows to her head; the petitioner confessed to his father, sister, and girlfriend that he killed his wife by beating her in the head with a hammer; a bloody hammer was found near the victim; forensic testing established that the victim's blood was on the petitioner's clothing and on the hammer; and the testimony of multiple witnesses placed the petitioner at the victim's apartment at the time of the crime. The petitioner's suggestion that someone else committed the crime was soundly defeated by the State's evidence.

Regarding the element of intent,[17] the Court has explained that

---

[17]For first degree murder, the term "malice" is often used interchangeably with "specific intent to kill" or "intentional killing." *State v. Hatfield*, 169 W.Va. 191, 198, 286 S.E.2d 402, 407 (1982); *State v. Davis*, 205 W.Va. 569, 583, 519 S.E.2d 852, 866 (1999).

"[t]he customary manner of proving malice in a murder case is the presentation of evidence of circumstances surrounding the killing. *State v. Starkey*, 161 W.Va. [517] at 522, 244 S.E.2d [219] at 223 [1978]. Such circumstances may include, inter alia, the intentional use of a deadly weapon, *State v. Toler*, 129 W.Va. 575, 579-80, 41 S.E.2d 850, 852-53 (1946), words and conduct of the accused, *State v. Hamrick*, 112 W.Va. [157] at 166-67, 163 S.E. [868] at 873 [1932], and, evidence of ill will or a source of antagonism between the defendant and the decedent, *State v. Brant*, 162 W.Va. 762, 252 S.E.2d 901, 903 (1979)." *State v. Evans*, 172 W.Va. 810, 813, 310 S.E.2d 877, 879 (1983).

*State v. White*, 231 W.Va. 270, 283-84, 744 S.E.2d 668, 681-82 (2013). The jury's finding of malice is supported by the evidence that the petitioner inflicted multiple, savage hammer blows to his estranged wife's head. These blows were so numerous and forceful that they depressed her face and exposed her brain matter. Moreover, the jury heard how the petitioner was upset that his wife would not agree to reconcile with him and was instead having relationships with other people.

The focus of the petitioner's argument on appeal pertains to the elements of premeditation and deliberation.[18] With regard to these elements, the Court has held:

Although premeditation and deliberation are not measured by any particular period of time, there must be some period between the formation of the intent to kill and the actual killing, which indicates the killing is by prior calculation and

---

[18]In addition to first degree murder with or without mercy, the jury was instructed on the lesser-included offenses of murder in the second degree and voluntary manslaughter.

design. This means there must be an opportunity for some reflection on the intention to kill after it is formed.

*Guthrie*, 194 W.Va. at 664, 461 S.E.2d at 170, syl. pt. 5.

> In criminal cases where the State seeks a conviction of first degree murder based on premeditation and deliberation, a trial court should instruct the jury that murder in the first degree consists of an intentional, deliberate, and premeditated killing which means that the killing is done after a period of time for prior consideration. The duration of that period cannot be arbitrarily fixed. The time in which to form a deliberate and premeditated design varies as the minds and temperaments of people differ and according to the circumstances in which they may be placed. Any interval of time between the forming of the intent to kill and the execution of that intent, which is of sufficient duration for the accused to be fully conscious of what he intended, is sufficient to support a conviction for first degree murder.

*Id.* at 664, 461 S.E.2d at 170, syl. pt. 6, in part. Moreover,

> "[a] jury must consider the circumstances in which the killing occurred to determine whether it fits into the first degree category. Relevant factors include the relationship of the accused and the victim and its condition at the time of the homicide; whether plan or preparation existed either in terms of the type of weapon utilized or the place where the killing occurred; and the presence of a reason or motive to deliberately take life. No factor is controlling. Any one or all taken together may indicate actual reflection on the decision to kill. This is what our statute means by 'willful, deliberate and premeditated killing.'" *State v. Guthrie*, 194 W.Va. 657, 675, [n.23,] 461 S.E.2d 163, 181 n. 23 (1995).

*Browning*, 199 W.Va. at 421, 485 S.E.2d at 5.

The petitioner claims there was no evidence that he contemplated killing his wife or had any opportunity for reflection. The record contradicts this assertion. The petitioner was upset that his wife was having relationships with other people, instead of reconciling with him. He had made prior threats to harm or kill her. The petitioner had been exhibiting behavior of concern to Ms. Strong, causing her to ask his father to speak with him. Knowing the petitioner was going to his estranged wife's apartment that night, Rick Greenfield was worried enough to caution the petitioner against bringing a firearm. Moreover, even if the petitioner and the victim had argued about her sexual relations with other people, as the petitioner told his father and sister, that does not explain why he had the hammer with him. He was supposed to be dropping off their children that night, not performing work that would require a ball peen hammer. Because there were multiple tools in the petitioner's truck, and the hammer used to kill Mrs. Greenfield was a ball peen hammer in a weathered condition, the jury could have concluded that the petitioner brought the hammer with him into the apartment. Finally, the petitioner did not inflict just one blow to his wife; he brought the hammer down upon her face and head at least seven separate times. Considering all of the evidence in the light most favorable to the prosecution, we conclude there was sufficient evidence for the jury to find that the petitioner committed first degree murder.[19]

---

[19]In his final assignment of error, the petitioner contends that the cumulative weight of all of the errors at his trial warrant the granting of a new trial. Because we have found no error in this appeal, the cumulative error doctrine has no application. *See, e.g., State v.*

## IV.  Conclusion

For the foregoing reasons, we affirm the May 4, 2015, order of the Circuit Court of Berkeley County denying the petitioner's motions for a judgment of acquittal or, alternatively, a new trial.  The petitioner's conviction is hereby affirmed.

Affirmed.

---

*Knuckles*, 196 W.Va. 416, 426, 473 S.E.2d 131, 141 (1996).