**STATE OF WEST VIRGINIA
SUPREME COURT OF APPEALS**

**State of West Virginia,
Plaintiff Below, Respondent**

**vs.) No. 20-0553** (Berkeley County 19-F-308)

**T.J.,
Defendant Below, Petitioner**

# MEMORANDUM DECISION

Petitioner T.J.,[1] by counsel Matthew T. Yanni, appeals the July 23, 2020, order of the Circuit Court of Berkeley County sentencing petitioner to an aggregate sentence of incarceration of not less than eleven years nor more than fifty-five years upon his convictions for child abuse resulting in serious bodily injury, child abuse resulting in bodily injury, and gross child neglect creating substantial risk of death or serious bodily injury. Respondent State of West Virginia, by counsel Patrick Morrisey and Katherine M. Smith, filed a response in support of the circuit court's order.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the order of the circuit court is appropriate under Rule 21 of the Rules of Appellate Procedure.

On September 18, 2016, the one-year-old daughter of petitioner's girlfriend was severely injured while petitioner was supervising the child. At the time, petitioner was eighteen years old, and he, his girlfriend, and the child lived in the home of the girlfriend's father.

In October of 2019, petitioner was indicted on eight counts of child abuse resulting in serious bodily injury, four counts of child abuse causing injury, and one count of gross child neglect creating substantial risk of serious bodily injury. The indictment alleged that on September

---

[1] Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015); *In re Jeffrey R.L.*, 190 W. Va. 24, 435 S.E.2d 162 (1993); *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990).

1

18, 2016, petitioner struck, shook, or crushed the child's forehead, ears, cheeks, lips, hips, and hands, causing injury to the child. The indictment further alleged that petitioner failed to provide adequate medical care for the child's injuries. The same indictment charged petitioner's girlfriend with one count of child neglect causing bodily injury and one count of gross child neglect creating substantial risk of serious bodily injury.

Petitioner's case proceeded to trial on March 11, 2020. He and his girlfriend were tried together. The State called three witnesses: the investigating officer, Detective Sergeant Adam Albaugh of the Martinsburg City Police Department; a treating physician of the child, Michael S. Londner, MD; and another treating physician of the child and expert witness for the State, William E. Hauda II, MD.

The investigating officer testified that he examined the residence in which petitioner was living with the child and described the residence as "in various stages of deconstruction." He testified, "There were numerous hazards throughout the residence that could have caused injury or even death to adults and children. . . . It smelled like cat urine and animal feces." The investigating officer further testified that in the room shared by petitioner, his girlfriend, and the child, "[d]rywall [was] missing, exposing insulation to the living conditions of the room. . . ." The investigating officer witnessed bloodstains on the child's bedding inside the crib and on the floor outside of the crib.

Dr. Londner was working as an emergency physician at Berkeley Medical Center on September 18, 2016, when the child was brought to him by ambulance for treatment. He testified, "[W]e weren't sure if she was alive or not when she arrived. She was pretty battered and bruised and nonresponsive, and the medics were actively bagging her oxygen to support her breathing." Dr. Londner went on to state that because the child needed neurosurgical and respiratory care that Berkeley Medical Center could not provide, she was flown to Inova Fairfax Hospital & Trauma Center for further care. During his direct examination, the State questioned Dr. Londner as follows:

> Q.     Dr. Londner, I'm handing you what has previously been marked as State's Exhibits B-1 through B-14. Can you describe what those are[?]
>
> A.     They are photographs. They appear to be photographs of [the child] from the night of the - - from the night that she was admitted to the emergency department.
>
> Q.     Now, do these photos fairly and accurately depict her condition that night?
>
> A.     (Perusing) Yes, they do.
>
> MR. STAGGERS [State's counsel]: Your honor, the State would move for the admission of State's Exhibits B-1 through B-14 into evidence.
>
> THE COURT: Any objection?

2

. . . .

MR. YANNI [petitioner's trial counsel]: No objection.

THE COURT: They are admitted.

Thereafter, the State published Exhibits B-1 through B-14 to the jury. During cross-examination, Dr. Londner described the extent of the child's injuries:

[I]n 23 years, I have not seen someone [who was] beaten that severely. There [are] only one or two ways that that can happen[:] if she fell out of a helicopter perhaps or if she were at the top of a 30-foot flight of stairs and fell down three or four times, but those are just not normal injuries for someone to have from generic falls or a simple trauma.

Dr. Hauda was the State's final witness, and he was designated by the trial court as an expert in the forensic evaluation of injuries to children. He testified that he was a pediatric emergency physician and the Medical Director for the Inova Ewing Forensic Assessment and Consultation Teams ("FACT") Department at Inova Fairfax Hospital. Dr. Hauda explained that the purpose of the FACT Department is to see patients who are suspected of being abused or assaulted. He testified that he saw the child on September 19, 2016; September 21, 2016; September 23, 2016; and possibly on a date after that. He described her injuries as follows:

[S]he was essentially critically ill in the PICU [pediatric intensive care unit] with life-sustaining measures being used to keep her alive.

. . . .

So she had an incredible number of bruises. They were from her head down to her legs, on all surfaces of her body. They were - - we can't say how old they are because we really can't age bruises, but they all had similar coloration. . . .

He went on to testify that the child "had a bleeding outside her brain but inside her skull" and that she had a "deeper injury inside the brain itself" to the corpus collosum. Dr. Hauda testified that "the pattern of bruising that she had did not look like what we would see with kids who are normally active and bumping into things, and she also had, like I said, like a huge number of bruises." Dr. Hauda also noted fractures to bones in both of the child's hands.

During Dr. Hauda's direct examination, a juror began crying and left the courtroom. The transcript of the trial regarding that incident reveals the following:

Q.    Now, based upon, you know, your review and your evaluation, you have mentioned a strike there. Is it your belief that this bruising on her face, in at least seven separate areas that we have discussed, that the mechanism of injury for that was a strike?

3

A. That, to a reasonable degree of medical certainty, it was from impacts from strikes as opposed to impacts from falling, yes.

Q. And those multiple strikes about the head, how would those strikes have - - or would those strikes have caused the brain injury that you observed in [the child]?

A. So as we talked about before, so you can have one impact that can cause bleeding and severe trauma to the brain, like a motor vehicle crash or a fall from a significant height, those sorts of things.

You can also have repeated strikes that cause injury to the brain because the brain is being repetitively moved back and forth during strikes.

It could also occur with shaking. So you could pick an infant up and shake them and get their head to swing back and forth as well. So - -

JUROR: I'm sorry.

(Juror left courtroom, crying.)

THE COURT: Let's take a break.

THE BAILIFF: All rise. Do you want them all in the same room?

THE COURT: Yes, the jury.

(Jury leaving the courtroom at 12:03 p.m.)

THE COURT: You may be seated.

It is 12:00 which would normally be the time that we would give our jury a lunch break. It didn't end in a way that made it clear to them that that's what we are doing, so I am going to have to bring them back in for a moment to tell them that we are going to do that, but at this time, do the attorneys need to address anything on our record?

MR. KINSER [State's counsel]: Not from the State.

MR. TAYLOR [petitioner's girlfriend's counsel]: I think just for purposes of the record, one of the - - I didn't get a good look at the lady, but one of the female jurors broke out into tears and basically got up and started to walk out of the courtroom, and that's when the Court excused the jury. . . .

. . . .

4

THE COURT: Is there a motion to allow that juror to be excused and replace her with a - - one of our alternates?

MR. TAYLOR: Yes, Your Honor.

. . . .

MR. TAYLOR: . . . The inquiry should not be limited to whether she feels that she can continue but whether or not she feels she can be fair and impartial at this point. . . .

MR. KINSER: I wouldn't object to that question, Judge.

THE COURT: Okay. Do you wish to weigh in on this issue, Mr. Yanni?

MR. YANNI: No, Your Honor. I think the issue is developed. Thank you.

THE COURT: Okay. I will do a little bit of research over the lunch hour. I am not sure if she can be rehabilitated at this point. So having colloquy with her, outside the presence of the other jurors, is also a question in my mind, whether that is going to be an adequate way to move beyond where we are right now; but I will bring them back in and tell them we are taking an hour lunch break . . . .

After the lunch break, the trial court decided to release the crying juror and replace her with one of the alternate jurors. Petitioner joined in his girlfriend's motion for a mistrial, but the trial court denied the motion and gave the jury the following cautionary instruction:

And I just wanted to express to you that these are difficult and emotional cases, and they have to be decided by the jury based upon the evidence and the instruction of the law and not upon emotion. So that being said, we are all human beings and we are going to have emotional responses to some of the testimony. So at any time during the proceedings, if you feel like things are getting to a point where you need a break, just raise your hand and don't be shy about it, just raise your hand, and we will take a break and come back when we are ready.

You are instructed to completely disregard the emotional reaction of the juror who has been released. You must not allow that to influence you in any way with regard to your duties to listen carefully to the evidence and the instructions from the Court and the arguments from counsel, and most importantly, your deliberations at the end of the case, because now you have twelve . . . who will be, at that stage of the proceedings, deliberating.

Dr. Hauda prepared a report concerning his evaluation of the child. The report contained numerous photographs of the child's injuries that were taken on September 19, 2016, while the

child was being treated at Inova Fairfax Hospital. While petitioner did object to the admission of the report, the objection was unrelated to the fact that the report contained photographs of the child's injuries. The trial court admitted the report into evidence over petitioner's objection. Ultimately, Dr. Hauda concluded that, to a reasonable degree of medical certainty, the injuries suffered by the child were the result of physical assault.

During petitioner's case-in-chief, seven witnesses testified, including Joseph Scheller, MD, and petitioner himself. Dr. Scheller, a pediatric neurologist, testified as an expert in the fields of pediatrics, child neurology, and neuroimaging. Dr. Scheller also prepared a report, and the report was admitted into evidence without objection. When asked whether he had formed an opinion as to the likely cause of the child's head injuries, Dr. Scheller testified:

> [W]hile it is a hundred percent true that it is possible that somebody violent or vicious took something and hit [the child] in the right side of the head with something, a fist, a baseball bat, and caused that subdural hematoma, because she is 17 months old, it's also possible that she did it to herself or somebody pushed her. It could have been a pet, it could have been another kid she was playing with, or it just could have been accidental . . . .
>
> . . . .
>
> And so if, indeed, she fell three or four feet onto a hardwood floor and whacked her head as part of that process, that certainly could explain the swelling in the right to the back of her head, the subdural hematoma, and the complications.

Regarding the injuries to the child's hands, Dr. Scheller testified, "[T]he fractures clearly are not an indication that [the child] was a victim of abuse or violence, in my view." Finally, as to whether the child was a clear victim of child abuse, Dr. Scheller concluded, "Despite the fact that [the child] has bruises, many bruises, as Dr. Hauda talked about, and despite the fact that [the child], on October 3rd, had one definite broken bone, no, I would not - - I can't say, I can't conclude that she was the victim of abuse."

During his direct examination, petitioner explained the events of September 18, 2016, as follows:

> A.      . . . [W]hen I made [the child] food again, she was in her crib. She was up but then she like laid back down, so I thought she was going to sleep, and I had already put the chicken nuggets in the oven, and I went downstairs for like a couple minutes, just to prepare it for her, and I hear a thud upstairs. Then I was thinking it was the baby gate. So I go upstairs, running, because my dog didn't interact with [the girlfriend's father's] other dogs, and I didn't want to start a conflict in there with the animals.
>
> Q.      You heard a thud. You thought that [your dog] had gotten out?
>
> A.      Yes. So I run, I rush upstairs and [the child] was on the floor, gasping

for air.

> Q. What did you do next?
>
> A. Well, I picked her up. She was burning - -
>
> . . . .
>
> A. I didn't check her temperature or nothing. I just - - I felt her head and it was burning. So I did what my grandmother did with me when I had a fever. I just tried to run a little cold water over the face to cool her down and tried to like bring back consciousness . . . .
>
> . . . .
>
> Q. What ultimately happened?
>
> A. Well, lucky enough, it was just a few minutes prior when this incident happened. . . . [A]fter I put the cold water on her, [petitioner's girlfriend] and [the girlfriend's father] come in the house . . . and I rushed downstairs with the baby and immediately [the girlfriend's father] calls 911 and he does CPR with the baby.

Petitioner also discussed the injuries portrayed in Exhibits B-1 through B-8. He testified that while he had witnessed some bruising to the child's hip areas, he believed those injuries were caused when the child slid down stairs on her rear end. He claimed he was in Maryland when the child sustained those bruises along with the bruises on her head. He testified that the injury to the child's mouth occurred when she fell from her crib. He denied ever striking, spanking, or beating the child.

The jury found petitioner guilty of four counts of child abuse resulting in serious bodily injury; two counts of child abuse causing bodily injury, a lesser included offense of child abuse causing bodily injury; and one count of gross child neglect creating substantial risk of death or serious bodily injury. Petitioner was acquitted of two counts of child abuse resulting in serious bodily injury and four counts of child abuse causing injury. The jury found petitioner's girlfriend guilty of one count of child neglect causing bodily injury and one count of child neglect creating a substantial risk of bodily injury, which is a lesser included offense of gross child neglect creating substantial risk of death or serious bodily injury. The jury's verdict was memorialized in a conviction order entered by the trial court on March 18, 2020.

Less than a week after the trial court entered its conviction order, petitioner filed a motion for a new trial. In the motion, petitioner argued that "State's Exhibits B#" should have been excluded under Rule 403 of the West Virginia Rules of Evidence because the exhibits were more prejudicial to petitioner than probative. The motion asserted that the exhibits "showed highly inflammatory pictures of a badly bruised child that were not relevant to the charges listed because documentation of all injuries to [the child] were covered in the expert report of Dr. Hauda."

Petitioner admitted that he "did not appreciate the impact that [the exhibits] would have on the jury" at the time they were admitted. Petitioner argued that the exhibits were distinguishable from the single photograph admitted in *State v. Greenfield*, 237 W. Va. 773, 791 S.E.2d 403 (2016), wherein the Court held that one color photograph depicting the extent of the victim's injuries was more probative than prejudicial. Petitioner claimed that "the jury was clearly overwhelmed by the presentation of this photographic evidence and its verdicts of guilty should be reversed in favor of a new trial."

By order entered on May 13, 2020, the trial court denied petitioner's motion for a new trial. The trial court noted that petitioner did not object prior to the admission of the exhibits, he did not object before the exhibits were published for the jury, and he did not object before the exhibits were made part of the evidence the jury considered in its deliberations. The trial court stated that even if a timely objection had been made, the exhibits were not more prejudicial than probative. The trial court went on to state that the exhibits "were relevant and admissible evidence of the nature of the injuries to the infant." The trial court relied on *State v. Lowery*, 222 W. Va. 284, 664 S.E.2d 169 (2008) (concluding that a mistrial was not warranted where a spectator in the courtroom was ejected after an outburst and the jury was instructed to disregard the outburst), and *Taylor v. State*, 690 A.2d 933 (Del.1997) (concluding that a mistrial was not warranted where a witness had an emotional outburst and the trial court immediately instructed the jury to decide the case on the evidence rather than their feelings), in determining that the crying juror should be dismissed, that a curative instruction should be given to the jury, and that a mistrial was unnecessary.

Petitioner was sentenced by order entered on July 23, 2020. Petitioner received an aggregate sentence of incarceration of not less than eleven years nor more than fifty-five years. Petitioner now appeals the denial of his motion for a new trial.[2]

On appeal, petitioner asserts one assignment of error: He argues that the trial court abused its discretion in failing to grant him a new trial on the ground that the photographs in State's Exhibits B-1 through B-14 were cumulative and unfairly prejudicial. The Court applies the following standard in reviewing a trial court's order denying a motion for a new trial:

> In reviewing challenges to findings and rulings made by a circuit court, we apply a two-pronged deferential standard of review. We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a de novo review.

Syl. Pt. 3, *State v. Vance*, 207 W. Va. 640, 535 S.E.2d 484 (2000).

---

[2] Petitioner timely filed his notice of appeal on July 28, 2020. On August 3, 2020, the trial court entered an amended sentencing order clarifying that petitioner had also received fines totaling $5,200 in addition to his aggregate sentence of incarceration of not less than eleven years nor more than fifty-five years.

Petitioner admits that he did not object to the exhibits when they were admitted; however, he claims he did not object because he did not appreciate the impact the exhibits would have on the jury at the time they were admitted. He asserts that the impact of the exhibits on the jury was magnified by Dr. Hauda's report and by the State "continually parading" the exhibits in front of the jury. Petitioner contends that the facts of *Greenfield* and *State v. Derr*, 192 W. Va. 165, 451 S.E.2d 731 (1994), support his position that Exhibits B-1 through B-14 constituted a "parade of horrors" and should have been excluded. He concedes that, because he did not object to the admission of the exhibits, the plain error doctrine applies to his claim.

It is undisputed that petitioner did not object to the admission of Exhibits B-1 through B-14 at any point before or during his trial. We have long recognized that

> "[o]ne of the most familiar procedural rubrics in the administration of justice is the rule that the failure of a litigant to assert a right in the trial court likely will result" in the imposition of a procedural bar to an appeal of that issue. *United States v. Calverley,* 37 F.3d 160, 162 (5th Cir.1994) (*en banc*), *cert. denied,* 513 U.S. 1196, 115 S.Ct. 1266, 131 L.Ed.2d 145 (1995). As the United States Supreme Court stated in *United States v. Atkinson,* 297 U.S. 157, 159, 56 S.Ct. 391, 392, 80 L.Ed. 555, 557 (1936), "[t]his practice is founded upon considerations of fairness to the court and to the parties and of the public interest in bringing litigation to an end after fair opportunity has been afforded to present all issues of law and fact."

*State v. Miller*, 194 W. Va. 3, 17-18, 459 S.E.2d 114, 128-29 (1995). Where a petitioner fails to assert a right in the trial court, "[t]he 'plain error' doctrine grants appellate courts, in the interest of justice, the authority to notice error to which no objection has been made." *Id.* at 18, 459 S.E.2d at 129; *see also* W. Va. R. Crim. P. 52(b) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."). We have consistently held that, "[t]o trigger application of the 'plain error' doctrine, there must be (1) an error; (2) that is plain; (3) that affects substantial rights; and (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings." *Miller*, 194 W. Va. at 7, 459 S.E.2d at 118, Syl. Pt. 7. Thus, our first inquiry is to determine "whether there has in fact been error at all." *Id.* at 18, 459 S.E.2d at 129.

As noted above, petitioner argues that the trial court erred by admitting Exhibits B-1 through B-14 on the ground that the exhibits were cumulative and unfairly prejudicial. His argument implicates Rule 403 of the West Virginia Rules of Evidence, which provides, "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." With regard to the admission of photographs specifically, we have held that when a party challenges the admission of a photograph, the trial court must

> consider whether the probative value of the exhibit is substantially outweighed by the counterfactors listed in Rule 403 of the West Virginia Rules of Evidence. As to the balancing under Rule 403, the trial court enjoys broad discretion. The Rule 403

balancing test is essentially a matter of trial conduct, and the trial court's discretion will not be overturned absent a showing of clear abuse.

*Derr*, 192 W. Va. at 168, 451 S.E.2d at 734, Syl. Pt. 10, in part.

Having carefully reviewed the appendix record, we conclude that, regardless of whether petitioner had challenged the admission of Exhibits B-1 through B-14 below, the exhibits would have been properly admitted into evidence at petitioner's trial by the trial court. The exhibits were not cumulative, nor were they unfairly prejudicial.

The exhibits were not cumulative of each other in that the different photographs depicted the child's various and extensive injuries at the time she appeared at Berkeley Medical Center on September 18, 2016. The exhibits were also not cumulative of the photographs contained in Dr. Hauda's report, which were taken during the child's treatment at Inova Fairfax Hospital, because the different sets of photographs can be compared to determine any differences in the child's injuries over time, and the timing of the injuries was at issue during petitioner's trial. Neither *Greenfield* nor *Derr* is instructive as to the cumulative nature of photographs in that those cases involved the admission of a total of one and two photographs, respectively, and neither case involved an allegation that the photographic evidence was cumulative.

Furthermore, although the exhibits are disturbing in that they depict extensive bruising to the body of a small child, the exhibits accurately depicted the extent of the injuries to the child on the day the child appeared at Berkeley Medical Center. Thus, the exhibits were highly probative to the charges against petitioner. Additionally, the exhibits were not unfairly prejudicial because the probative value of the exhibits clearly outweighed any prejudicial impact. *Cf. Greenfield*, 237 W. Va. at 784, 791 S.E.2d at 414 (concluding that the probative value of a color photograph of the victim, rather than a black and white photograph, outweighed any prejudicial effect because the black and white photo "would not have accurately depicted the victim's condition"); *Derr*, 192 W. Va. at 178, 451 S.E.2d at 744 (finding "that the probative value in showing the jury the condition, identity, and location of the body clearly outweigh[ed] any speculative prejudicial effect").

Consequently, our examination of petitioner's claim of plain error begins and ends with the first of the four factors set forth in Syllabus Point 7 of *Miller*. Petitioner has failed to demonstrate that the trial court's admission of Exhibits B-1 through B-14 was in error, and so we need not examine the remaining three factors of the plain error doctrine, and we conclude that petitioner is entitled to no relief under the plain error doctrine. Additionally, because petitioner has failed to establish plain error in the admission of the exhibits, he has also failed to show that the trial court abused its discretion by denying his motion for a new trial.[3] Accordingly, he is entitled to no relief through this appeal.

---

[3] In his brief, petitioner also asserts that the trial court wrongly relied on *Lowery* and *Taylor* in denying him a new trial because "it is clear that the jury's passions were inflamed by the presentation of the evidence." We observe, as does respondent, that petitioner has not argued in this appeal that the trial court's decision to excuse the crying juror, which was based on *Lowery* and *Taylor*, was in error. Accordingly, that issue is not addressed in this memorandum decision.

For the foregoing reasons, we affirm.

Affirmed.

**ISSUED:**  January 12, 2022

**CONCURRED IN BY:**

Chief Justice John A. Hutchison
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice Evan H. Jenkins
Justice William R. Wooton