IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2017 Term

No. 16-0461

**FILED**
**May 23, 2017**
released at 3:00 p.m.
RORY L. PERRY, II CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

STATE OF WEST VIRGINIA,
Plaintiff Below, Respondent

v.

JERRY E. BERRY,
Defendant Below, Petitioner

Appeal from the Circuit Court of Summers County
Honorable Robert A. Irons, Judge
Criminal Action No. 15-F-57

AFFIRMED

Submitted: May 2, 2017
Filed: May 23, 2017

Scott E. Johnson, Esq.
Appellate Counsel
Public Defender Services
Charleston, West Virginia
Attorney for Petitioner

Patrick Morrisey, Esq.
Attorney General
Zachary A. Viglianco, Esq.
Assistant Attorney General
Gordon L. Mowen, II, Esq.
Assistant Attorney General
Charleston, West Virginia
Attorneys for Respondent

CHIEF JUSTICE LOUGHRY delivered the Opinion of the Court.

SYLLABUS BY THE COURT

1. "'"Upon motion [for judgment of acquittal], the evidence is to be viewed in the light most favorable to [the] prosecution. It is not necessary in appraising its sufficiency that the trial court or reviewing court be convinced beyond a reasonable doubt of the guilt of the defendant; the question is whether there is substantial evidence upon which a jury might justifiably find the defendant guilty beyond a reasonable doubt." *State v. West*, 153 W.Va. 325, [168 S.E.2d 716] (1969).' Syl. Pt. 1, *State v. Fischer*, 158 W.Va. 72, 211 S.E.2d 666 (1974)." Syl. Pt. 5, *State v. Grimes*, 226 W.Va. 411, 701 S.E.2d 449 (2009).

2. "The function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt." Syl. Pt. 1, *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995).

3. "'"A judgment of conviction will not be reversed because of improper remarks made by a prosecuting attorney . . . to a jury which do not clearly prejudice the accused or result in manifest injustice." Syl. pt. 1, *State v. Dunn*, 162 W.Va. 63, 246 S.E.2d

i

245 (1978), *in part*.' Syllabus Point 1, *State v. Barker*, 168 W.Va. 1, 281 S.E.2d 142 (1981)." Syl. Pt. 7, *State v. Buck*, 170 W.Va. 428, 294 S.E.2d 281 (1982).

4. "The essential elements of embezzlement are a trust relationship to the property or money involved, belonging to someone else and in the possession of the defendant by virtue of his office and converted to his own use with intent to defraud." Syl. Pt. 19, *State v. Riley*, 151 W.Va. 364, 151 S.E.2d 308 (1966), *overruled on other grounds by Proudfoot v. Dan's Marine Serv., Inc.,* 210 W.Va. 498, 558 S.E.2d 298 (2001).

5. "[I]n order to constitute the crime of embezzlement, it is necessary to show (1) the trust relation of the person charged, and that he falls within that class of persons named; (2) that the property or thing claimed to have been embezzled or converted is such property as is embraced in the statute; (3) that it is the property of another person; (4) that it came into the possession, or was placed in the care, of the accused, under and by virtue of his office, place or employment; (5) that his manner of dealing with or disposing of the property, constituted a fraudulent conversion and an appropriation of the same to his own use; and (6) that the conversion of the property to his own use was with the intent to deprive the owner thereof." Syl. Pt. 2*, in part, State v. Moyer*, 58 W.Va. 146, 52 S.E. 30 (1905).

6.  "A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt. To the extent that our prior cases are inconsistent, they are expressly overruled." Syl. Pt. 3, *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995).

7.  "'Four factors are taken into account in determining whether improper prosecutorial comment is so damaging as to require reversal: (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters.' Syl. Pt. 6, *State v. Sugg*, 193 W.Va. 388, 456 S.E.2d 469 (1995)." Syl. Pt. 6, *State ex rel. Games-Neely v. Yoder*, 237 W.Va. 301, 787 S.E.2d 572 (2016).

LOUGHRY, Chief Justice:

The petitioner, Jerry E. Berry, appeals from the April 15, 2016, final order of the Circuit Court of Summers County sentencing him to one to ten years imprisonment upon his jury conviction of one count of the felony offense of embezzlement.[1]  In this appeal, the petitioner contends the circuit court erred by not granting his motions for judgment of acquittal because the State failed to present sufficient evidence at trial to support his conviction.  The petitioner also argues the circuit court erred by not granting his motion for a mistrial after the prosecuting attorney made improper remarks during the closing argument phase of his trial.  Upon consideration of the parties' briefs and oral arguments, the submitted appendix record, and the pertinent authorities, we find no error.  Accordingly, we affirm.

## I.  Factual and Procedural Background

The petitioner was elected to the Summers County Commission in November 2000, and served as a commissioner until 2012.  During his tenure on the Commission, the petitioner was a member of the board of directors of the regional convention and visitor's bureau, which does business as Visit Southern West Virginia (hereinafter "Visit WV").[2]  He

---

[1]The petitioner was also ordered to pay restitution in the amount of $41,699.00 and all court costs within one year following his release from incarceration.

[2]This entity is comprised of nine southern West Virginia counties including Summers County.

also became president of the local convention and visitor's bureau in Summers County known as Three Rivers Travel Council (hereinafter "TRTC").[3] A convention and visitor's bureau is a "nonstock, nonprofit corporation with a full-time staff working exclusively to promote tourism and to attract conventions, conferences and visitors to the municipality, county or region in which such convention and visitor's bureau . . . is located or engaged in business within." W.Va. Code § 7-18-14(d)(1) (2015). Convention and visitor's bureaus are funded through the collection of a hotel occupancy tax imposed by the governing bodies of municipalities and counties.  W.Va. Code § 7-18-1.

In 2015, a Summers County grand jury returned an indictment, charging that the petitioner "did feloniously embezzle, fraudulently convert to his own use and steal . . . money . . . belonging to the Commission of Summers County, to-wit taking and converting $41,699.05 . . . by virtue of his employment at Three Rivers Travel Council[.]"  The petitioner's trial occurred on January 20 and 21, 2016.  The State's witnesses included Arnold Douglas Maddy, the president of Visit WV.  He testified that sometime in late 2009 or early 2010, the Summers County Commission entered into an arrangement with Visit WV

---

[3]The petitioner's work for the convention and visitor's bureaus was separate from and not a part of his duties as a county commissioner.

2

to manage the hotel occupancy tax funds that were being distributed to TRTC.[4] Explaining

further, Mr. Maddy stated,

> The [Summers County] convention and visitors bureau [TRTC] had financial difficulties. And we were getting, in my office, a lot of phone calls from vendors that they did business with, trying to collect outstanding bills. And so we entered into an arrangement with the County Commission that we would–if they would give us the entirety of the hotel/motel tax, we would take the 35 percent that was to go to the local CVB, pay their bills with them. There's no fee involved. We'd just manage their money for them, pay off all their bills. And then, of course, we would take our 15 percent and put it into our marketing effort. And we did that until all those bills were paid. And I believe it was in January 2010.[5] (footnote added)

According to Mr. Maddy, after Visit WV paid the debts of TRTC, he informed the Summers

County Commission that Visit WV wished to end their arrangement and Visit WV would be

returning the remaining funds that belonged to TRTC. On January 29, 2011, Mr. Maddy

wrote a check for $41,699.05 made payable to "Three Rivers Travel Council," which was the

---

[4]Summers County Commissioner Lloyd Lightner testified that fifty percent of the hotel occupancy tax collected in Summers County was used for parks and recreation, thirty-five percent was distributed to TRTC, and the remaining fifteen percent was given to Visit WV.

[5]The record indicates that in the early 2000s, the local convention and visitor's bureau in Summers County, then known as the Summers County Convention and Visitor's Bureau, was mismanaged and incurred significant debt. It was eventually reorganized and became known as Three Rivers Travel Council. However, further poor management resulted in a lapse of TRTC's registration as a legal entity with the West Virginia Secretary of State in November 2009. As Mr. Maddy testified, at that juncture, the Summers County Commission sought the assistance of Visit WV to financially rehabilitate the entity.

balance of the hotel occupancy tax that the Summers County Commission had allocated to

Visit WV to pay the debts of TRTC.

During Mr. Maddy's testimony, the State submitted into evidence a letter he

wrote to Commissioner Lightner on behalf of Visit WV dated May 27, 2011. The letter

stated, in pertinent part:

> Our Board of Directors advised us that once the debt for the
> Three Rivers Travel Council was paid off that we would no
> longer be able to perform any accounting or payroll services.
> Our records indicate the debt was paid off at the end of July
> 2010. We also gave Commissioner Berry a check payable to
> Three Rivers Travel Council for $41,699.05 on January 29,
> 2011 to zero out the Summers County account. Our
> understanding was a new CVB was to be organized.[6] (footnote
> added)

It is undisputed that the $41,699.05 check was deposited into a bank account in the name of

"Timothy Jordan Berry d/b/a Three Rivers Travel Council." Timothy Jordan Berry is the

petitioner's son.[7]

---

[6]Commissioner Lightner testified that he did not know the check was given to the petitioner until he received this letter.

[7]The evidence indicated that the account was set up using the personal social security number of Timothy Jordan Berry and had a balance of $123.52 at the time the $41,699.05 check from Visit WV was deposited. The petitioner testified that his son "had nothing to do with the account" after it was established.

The State's expert witness, Lawrence Ickes, a forensic accountant, testified the bank records showed that the day after the check was deposited into the Timothy Jordan Berry account, $10,600.00 was withdrawn using a counter withdrawal slip made out to cash. Thereafter, numerous checks were written against the account, most of them were for "round, even amounts" and made out to cash. In addition, several internal bank transfers were made to another personal bank account of the petitioner's son and $15,000.00 was paid to closely-held corporations operated by the petitioner and his son.

Mr. Ickes further testified that two checks totaling $6,850.00 from BGN[8] Convention and Visitor's Bureau (hereinafter "BGN") were deposited into the account in August 2011. BGN was the third Summers County convention and visitor's bureau that was incorporated with the Secretary of State's office.[9] According to Mr. Ickes, by the end of September 2011, the account was almost depleted with a balance of only $247.00.

---

[8]"BGN" was used as an abbreviation for Bluestone, Greenbrier, and New, the three rivers that run through Summers County.

[9]Although it appears that BGN was a replacement for TRTC, which had lost its corporate status, documents in the record indicate that BGN was doing business as TRTC. In that regard, the record includes a June 21, 2011, agreement whereby the Summers County Commission agreed to distribute to BGN thirty-five percent of the hotel occupancy taxes collected during the term of the agreement. In exchange, BGN agreed to provide "certain marketing/promotional services and programs . . .designed to inform potential travelers of what Summers County and the New River Gorge Region has to offer[.]" This Agreement stated that BGN was doing business as TRTC. The Agreement was signed by the petitioner as the president of BGN.

Testifying in his own defense, the petitioner acknowledged that the $41,699.05 check was deposited into his son's personal bank account. However, the petitioner characterized his son's account as a "stopgap" measure, explaining that TRTC could not maintain its own bank account because it had lost its corporate status. The petitioner testified that he withdrew the money and used it to promote Summers County and the surrounding region. He stated that he went to various travel shows in other states where he paid "students or young people" $100 each, in cash, to hand out brochures promoting tourism in Summers County and the surrounding area. He explained that by the time he received the money from Visit WV, the season of tourism marketing was well underway, and he was unable to obtain space at these travel shows to set up his own booth. The petitioner also testified that he used the money to have brochures printed and for wages for his son, whom he employed to set up web pages for online promotion of Summers County and southern West Virginia because travel marketing was progressing in a digital direction. With regard to why he was unable to produce receipts to show how the money was spent, the petitioner testified he had an office at Concord University in Beckley, West Virginia, and that at some unspecified time, college personnel decided to re-purpose the space, which resulted in the destruction of his records.[10]

---

[10]Stephen D. Rowe, a retired professor from Concord University, testified on behalf of the petitioner. Mr. Rowe stated that the petitioner was a client of the Concord entrepreneurial development center and was provided an office through a grant program aimed at improving economic conditions in the state. On cross-examination, Mr. Rowe testified that when the University decided to re-purpose the space, he contacted the petitioner and informed him he needed to remove his personal items from his office. According to Mr. Rowe, the petitioner never came to collect anything from his office.

To support his testimony regarding his attendance at travel shows, the petitioner's ex-girlfriend testified on his behalf. She stated that she had accompanied the petitioner to some of the travel shows and observed him promoting Summers County by having students distribute tourism brochures. She was unable to say, however, how many travel shows she attended with the petitioner; nor could she recall exactly when the trips occurred.

After the parties gave their closing arguments, the petitioner moved for a mistrial, claiming the prosecuting attorney had made improper remarks during his rebuttal argument that constituted an impermissible shifting of the burden of proof. The trial court denied the motion. Thereafter, the jury returned a guilty verdict. On April 15, 2016, the circuit court entered its sentencing order confining the petitioner for an indeterminate prison term of not less than one nor more than ten years. This appeal followed.

## II. Standard of Review

As set forth above, the petitioner contends that the circuit court should have granted his motions for judgment of acquittal made at the close of the State's evidence and at the end of his trial because the State failed to present sufficient evidence to support a conviction. "The Court applies a de novo standard of review to the denial of a motion for judgment of acquittal based upon the sufficiency of the evidence." *State v. Juntilla*, 227

7

W.Va. 492, 497, 711 S.E.2d 562, 567 (2011) (citing *State v. LaRock*, 196 W.Va. 294, 304,

470 S.E.2d 613, 623 (1996)).  In addition,

> "'[u]pon motion [for judgment of acquittal], the evidence is to be viewed in the light most favorable to [the] prosecution. It is not necessary in appraising its sufficiency that the trial court or reviewing court be convinced beyond a reasonable doubt of the guilt of the defendant; the question is whether there is substantial evidence upon which a jury might justifiably find the defendant guilty beyond a reasonable doubt.' *State v. West*, 153 W.Va. 325, [168 S.E.2d 716] (1969)."  Syl. Pt. 1, *State v. Fischer*, 158 W.Va. 72, 211 S.E.2d 666 (1974).

Syl. Pt. 5, *State v. Grimes*, 226 W.Va. 411, 701 S.E.2d 449 (2009).  Explaining further, we

have stated:

> The function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt.

Syl. Pt. 1, *State v. Guthrie*. 194 W.Va. 657, 461 S.E.2d 163 (1995).

The petitioner also contends the circuit court erred by not granting his motion

for a mistrial after the prosecutor made improper remarks to the jury during his closing

argument.  "Our review of a circuit court's decision to deny a motion for a mistrial is

reviewed under an abuse of discretion standard." *State v. Robert Scott R., Jr.,* 233 W.Va. 12,

8

18, 754 S.E.2d 588, 594 (2014). Further, we have held that "'"[a] judgment of conviction will not be reversed because of improper remarks made by a prosecuting attorney . . . to a jury which do not clearly prejudice the accused or result in manifest injustice." Syl. pt. 1, *State v. Dunn*, 162 W.Va. 63, 246 S.E.2d 245 (1978), *in part*.' Syllabus Point 1, *State v. Barker*, 168 W.Va. 1, 281 S.E.2d 142 (1981)." Syl. Pt. 7, *State v. Buck*, 170 W.Va. 428, 294 S.E.2d 281 (1982). With these standards in mind, we will address the parties' arguments.

## III. Discussion

### A. Sufficiency of the Evidence

The petitioner contends the evidence presented during his trial was insufficient to support his conviction for embezzlement.[11] "The essential elements of embezzlement are a trust relationship to the property or money involved, belonging to someone else and in the possession of the defendant by virtue of his office and converted to his own use with intent to defraud." Syl. Pt. 19, *State v. Riley*, 151 W.Va. 364, 151 S.E.2d 308 (1966), *overruled on other grounds by Proudfoot v. Dan's Marine Serv., Inc.,* 210 W.Va. 498, 558 S.E.2d 298 (2001). Outlining the elements of embezzlement more distinctly, this Court long ago held:

> [I]n order to constitute the crime of embezzlement, it is necessary to show (1) the trust relation of the person charged, and that he falls within that class of persons named; (2) that the property or thing claimed to have been embezzled or converted is such property as is embraced in the statute; (3) that it is the

---

[11]*See* W.Va. Code § 61-3-20 (2014) (defining offense of embezzlement).

property of another person; (4) that it came into the possession, or was placed in the care, of the accused, under and by virtue of his office, place or employment; (5) that his manner of dealing with or disposing of the property, constituted a fraudulent conversion and an appropriation of the same to his own use; and (6) that the conversion of the property to his own use was with the intent to deprive the owner thereof.

Syl. Pt. 2, in part, *State v. Moyer*, 58 W.Va. 146, 52 S.E. 30 (1905). The petitioner claims that the State's evidence was insufficient with respect to the third, fifth and sixth elements of embezzlement outlined above. We address each of these elements, in turn, below.

**1. The property of another person was embezzled.** The petitioner asserts the State failed to prove that the money allegedly embezzled was property belonging to the Summers County Commission as set forth in the indictment. Arguing that the evidence at trial established that the money at the time of the alleged embezzlement was the private property of TRTC and not public money belonging to the Summers County Commission, the petitioner maintains that the State failed to present sufficient evidence to satisfy the third element of embezzlement set forth in syllabus point two of *Moyer*, 58 W.Va. at 146, 52 S.E. at 30-31. The petitioner's argument is premised upon his contention that "once the hotel tax revenues had been disbursed to the CVBs, it ceased being government money and became the sole property of the CVB(s)." Conversely, the State contends that whether the money belonged to the county commission or the convention and visitor's bureaus is irrelevant because it must only prove that the money at issue belonged to "another."

10

The State's burden with respect to proving ownership of property in embezzlement cases was addressed in *State v. Frasher*, 164 W.Va. 572, 265 S.E.2d 43 (1980), *overruled on other grounds by Guthrie*, 194 W.Va. at 657, 461 S.E.2d at 163. In that case, "the threshold question raised by the defendant [was] whether the embezzlement indictment was sufficient in charging that he embezzled from [Parkerburg] Datsun [an automobile dealership,] as distinguished from Datsun's purchasers." *Frasher*, 164 W.Va. at 575, 265 S.E.2d at 46. The evidence showed the defendant operated a business in Charleston that expedited the acquisition of automobile titles by automobile dealers for their purchasers. *Id.* at 574, 265 S.E.2d at 45. To accomplish this task for Datsun, the defendant's wife would travel to Parkersburg and obtain the title applications and checks from the dealership covering the title taxes and license fees. Upon her return, the defendant would deposit the checks and then write new checks on his business account made payable to the Department of Motor Vehicles to cover the fees and tax costs. He would then deliver the checks and applications to the Department of Motor Vehicles. After the automobile titles were obtained, the defendant's wife would return them to the Datsun dealership. *Id.*

The defendant was charged with embezzlement after it was discovered that he was altering the title applications to lower the stated value of the motor vehicles, which in turn reduced the amount of license taxes required to be paid. It was alleged that the defendant paid the lower amount of title tax and retained the difference. *Id.* Following his

11

embezzlement conviction, the defendant appealed, arguing the State failed to prove the identity of the actual owners of the property that was embezzled and that he was an agent within the meaning of the embezzlement statute. The defendant maintained that "Datsun was a mere conduit for paying to the Department of Motor Vehicles . . . the title taxes and license fees owed by the individual purchasers and that the indictment was insufficient in that it had to charge embezzlement from the purchasers themselves." *Id.* at 575, 265 S.E.2d at 46.

Recognizing that "the hallmark of embezzlement is the trust relationship and the subsequent conversion or appropriation of the entrusted property," this Court rejected the defendant's argument that the State was required to identify the true owner of the property. *Id.* at 576-77, 265 S.E.2d. at 47. Noting that "[o]ther state courts have . . . avoided imposing technical ownership requirements on the state in embezzlement cases," this Court explained that "[i]n both embezzlement and larceny cases it has long been held that a taking is wrongful, not only from the person owning legal title, but from any person entitled to possession." *Id.* at 579-80, 265 S.E.2d at 48 (additional citation omitted). Therefore, consistent with the majority of other courts, this Court concluded that "embezzlement can occur from one having the lawful possession of the property and that the true owner of the property need not be alleged in the indictment." *Id.* at 578, 265 S.E.2d at 47.

In the case at bar, the State presented evidence at trial which established that the petitioner was not personally entitled to the proceeds of the check issued by Visit WV to TRTC. In that regard, Mr. Maddy testified that Visit WV wished to relinquish financial control of TRTC, and that he wrote the $41,699.05 check to return the remaining hotel occupancy tax funds to TRTC. Whether the funds actually belonged to TRTC at that point, as opposed to the County Commission, is of no moment. The evidence presented by the State was sufficient to allow a rational jury to conclude the property alleged to have been embezzled belonged to another entity. Accordingly, there is no merit to the petitioner's argument that the State failed to present sufficient evidence concerning the ownership element of embezzlement.

**2. Fraudulent conversion and appropriation.** The petitioner next claims the State failed to present any evidence to show that he fraudulently converted and appropriated the $41,699.05 check for his own use. Essentially, the petitioner argues that in order to prove this element of embezzlement, the State was required to offer direct evidence in the form of receipts or testimony indicating he derived some personal gain from the money. The petitioner reasons that because "the State could provide no positive evidence that the money was converted to personal use rather that used for CVB purposes," fraudulent conversion and appropriation were not established. The State contends, however, that it was not required to present any direct, tangible proof that the petitioner converted the money to

13

his own personal use.  The State argues that circumstantial evidence, which it maintains was "plentiful and powerful" in this case, was sufficient to prove the petitioner fraudulently converted and appropriated the funds issued by Visit WV to TRTC.

It is well established that "this Court may accept any adequate evidence, including circumstantial evidence, as support for a conviction[.]" *State v. Greenfield,* 237 W.Va. 773, 786, 791 S.E.2d 403, 416 (2016).  Indeed, we have observed:

> Circumstantial evidence . . . is intrinsically no different from testimonial evidence. Admittedly, circumstantial evidence may in some case point to a wholly incorrect result. Yet this is equally true of testimonial evidence. In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference.  In both, the jury must use its experience with people and events in weighing the probabilities.   If the jury is convinced beyond a reasonable doubt, we can require no more.

*Guthrie*, 194 W.Va. at 668, 461 S.E.2d at 174 (quoting *Holland v. United States*, 348 U.S. 121, 139-40 (1954)).   We have also explained:

> A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden.  An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution.  The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court.  Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a

14

reasonable doubt. To the extent that our prior cases are inconsistent, they are expressly overruled.

*Guthrie*, 194 W.Va. at 663, 461 S.E.2d at 169, syl. pt. 3.

Upon review of the record, we find that the State presented sufficient evidence from which a rational jury could find that the petitioner fraudulently converted and misappropriated the $41,699.05 check. The State's evidence showed that the check was deposited into an account in the petitioner son's name which had been previously established using his son's personal social security number. The evidence further showed that a majority of the withdrawals made from the account were in cash for large, even sums, suggesting the money was not being used to reimburse vendors or other third parties for specific expenses. In addition, the State put forth evidence that several transfers of money were made to the petitioner's son and to corporations that the petitioner operated with his son. While the petitioner testified that the money transferred to his son's other account was for computer work he performed on behalf of TRTC, other testimony indicated his son was employed through an AmeriCorps grant program to perform that work. In addition, the lack of receipts or other documentation demonstrating the money was used for tourism promotional activities could have been viewed by the jury as evidence of fraudulent conversion and appropriation. Finally, Summers County Commissioner Jack Woodrum testified that the petitioner would give "no accounting" of how the money was spent, and when specifically asked, the petitioner "told [the other Commissioners] that it was proprietary information and wasn't any

15

of our business." Given all this evidence, we find no merit to the petitioner's argument that the State failed to present sufficient evidence to prove fraudulent conversion and appropriation.

**3. Intent to deprive.** The petitioner also claims that the State failed to prove he had the specific intent to deprive TRTC of its money. Acknowledging that he withdrew and spent money from the account where the check was deposited, the petitioner maintains there was no evidence he intended to deprive TRTC of the money in a way that was not in accordance with its statutory purpose to promote tourism. In contrast, the State argues that the circumstantial evidence which demonstrated fraudulent conversion and appropriation of the money also established a specific intent to so act.

Viewing the evidence in the light most favorable to the prosecution as *Guthrie* requires, we find that a rational jury could have concluded the petitioner's actions showed a willful intent to deprive TRTC of the money. In particular, the direct transfer of money to another personal account held by the petitioner's son and to corporations he was operating with his son could have easily been considered by the jury as evidence of a specific intent to deprive TRTC of the money. Moreover, the State presented evidence that in 2011, a new local convention and visitor's bureau for Summers County was incorporated with the Secretary of State's office using the name BGN Convention and Visitor's Bureau. There was

16

testimony that the petitioner deposited at least two checks from BGN's bank account into the same account held by his son in which the $41,699.05 check was deposited. Based on this evidence, a rational jury could have concluded that the petitioner was not using his son's account as a "stopgap" measure as he claimed but instead, had a specific intent to deprive TRTC of its money. Accordingly, we find no merit to the petitioner's argument that the State failed to present sufficient evidence to prove the intent element of embezzlement.

Based on all of the above, we find the State presented sufficient evidence to support the petitioner's conviction. Consequently, the circuit court did not err by denying the petitioner's motions for judgment of acquittal.

## B. The Prosecutor's Remarks

The petitioner contends the trial court erred by not granting his motion for a mistrial because the prosecuting attorney made comments during his closing argument suggesting that the petitioner had the burden of proof. The prosecutor's rebuttal closing argument, in pertinent part, was as follows:

> I do get the last word in this, but I'm limited to rebuttal. That is to say, I can't bring up any new issues. I can't really extend on any issues that I brought up in the first part of the closing, but only to talk about what was said by the defense closing.
>
> So let's just get to the two questions real quick. How was the money misused? Money was misused in the form of $5,000

17

during the time period we're talking about here, February to September, by paying the same to Timothy Jordan Berry. The explanation you get? He was working under a grant. He wasn't working for the CVB under a grant. He was working for AmeriCorps under a grant. How else was the money used? Well, there's Jerry Berry, $15,400 in cash. In cash.

One of the things I wrote down when I finished here was, I also wanted to see how some questions were answered. And *one of the questions I wanted to hear the defense answer, but they did not, was about the rebates.* This big chunk of even dollars. If I'm given $100 by my principal, by my employer, by my person who has hired me to do something or appointed me to do something and they say, go buy a pack of cigarettes for me, shouldn't I be returning about $94, $95 back to the principal, to the agent, to the account that set up by the defendant? Even dollars, no rebates showing in State's Exhibit No. 3, which is a list of account statements, bank statements for monthly, like everybody here has probably gotten at one point or another.

. . . .

*The last thing that I wanted to do for rebuttal, that I was waiting to hear from Mr. Seay, who is obviously a very talented young attorney, was to hear about the check – checks, two checks, in August, months after BGN had become a valid travel council. Why was BGN paying that money, about $6,000 worth over into the account of an invalid emergency account – if you believe the defendant, an emergency account, that he had to use it there?* Why wasn't the money flowing in the other direction? I know something about the rivers in Summers County. They flow downstream. And this one should have. The fourth one should have also. But it didn't. It flowed upstream. It flowed from the emergency account that was set up till they could get a proper CVB set up, and then into the account that there was– an emergency one that just happened to be in his son's name. (emphasis added)

18

"This Court has held that whether improper argument by the prosecution has so prejudiced the trial process as to require reversal must be gauged from the facts of each trial." *State v. Sugg,* 193 W.Va. 388, 405, 456 S.E.2d 469, 486 (1995). We have also stated that "[t]he test is whether the remarks 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Id.* (quotin*g Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

> "Four factors are taken into account in determining whether improper prosecutorial comment is so damaging as to require reversal: (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters." Syl. Pt. 6, *State v. Sugg*, 193 W.Va. 388, 456 S.E.2d 469 (1995).

Syl. Pt. 6, *State ex rel. Games-Neely v. Yoder*, 237 W.Va. 301, 787 S.E.2d 572 (2016).

Considering the factors set forth above, the petitioner argues that the questions posed by the prosecutor in his rebuttal caused the jury to believe he had some sort of obligation to demonstrate his innocence. Elaborating further, the petitioner contends that when the prosecutor said the defense left questions unanswered and that he wanted to hear more from the defense, the prosecutor shifted the burden of proof and easily confused the jury. The petitioner further argues that these rebuttal comments were necessarily prejudicial because he was unable to respond. Maintaining that the State's evidence of fraudulent

19

conversion and intent to deprive was "flimsy if it existed at all," the petitioner asserts the prosecutor's comments clearly should have caused the trial court to declare a mistrial.

The State submits there is simply no authority to support the petitioner's contention that the prosecuting attorney shifted the burden of proof by posing questions to the jury during his closing argument. The State argues that the prosecutor's remarks were "undeniably isolated" because they were only made during rebuttal. Further, the State claims there is no basis to classify the comments as a "diversion" because they were clearly meant to focus the jury's attention on a favorable inference from the evidence–"namely that the petitioner's withdrawal of large even sums of cash and failure to ever deposit leftover money . . . demonstrated that he was using the money as a personal slush fund." The State concludes that in light of the substantial amount of circumstantial evidence presented that indicated the petitioner was guilty, the remarks did not mislead the jury.

We have recognized that "[a] proper closing argument in a criminal case involves the summation of evidence, any reasonable inferences from the evidence, responses to the opposing party's argument, and pleas for law enforcement generally." *Guthrie,* 194 W.Va. at 678-79 n.27, 461 S.E.2d at 184-85 n.27. As the trial transcript shows, the petitioner's attorney asserted during his closing that the prosecutor had failed to answer the question of "how was the money misused?" He further queried: "Why didn't [the

20

prosecutor] give you all the pieces of the puzzle?" The prosecutor's rebuttal comments were clearly a response to the questions posed by the petitioner's attorney during his own closing and an attempt to demonstrate that the evidence did not fit within the petitioner's theory of the case.

We have found that a prosecutor's use of questions to make reasonable inferences from the evidence and demonstrate inconsistencies in the defendant's testimony does not constitute reversible error. *See State v. Johnson*, 187 W.Va. 360, 364 n.7, 419 S.E.2d 300, 304 n.7 (1992) (finding prosecutor was not attempting to shift burden of proof when stating to jury that defense counsel should have explained "[w]hy the defendant is so sure that during his blackout the shooting of his brother was accidental"); *accord Commonwealth v. Mattel*, 62 N.E.3d 86 (Mass.App.Ct. 2016) (concluding burden was not shifted by prosecutor's use of rhetorical questions to demonstrate defendant's explanation for knocking down assault victim's door was implausible); *State v. Osman*, 366 P.3d 956 (Wash. App. 2016) (holding that prosecutor's argument did not shift burden of proof because questions were used to demonstrate that evidence "did not support any other reasonable explanation"). In this case, it is clear that the prosecutor questioned the deposit of money from BGN's account to show that the petitioner's explanation of why he put the money in his son's account–as a "stopgap measure"–was not credible. Having considered the remarks in the context of the entire trial, we are unable to find they were clearly prejudicial or resulted

21

in manifest injustice.  Accordingly, the circuit court did not abuse its discretion by denying the petitioner's motion for a mistrial.

## IV.  Conclusion

For the reasons set forth above, we affirm the petitioner's conviction and the circuit court's April 15, 2016, final order.

Affirmed.